UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARA ALBOYACIAN, MIKE AGOLIA, ARED ANAC, HAGOP BAGA, EDWARD BALLOUTINE, DAVID CHONG, SEVAN CURUKCU, ALFRED DEPPE, JOSEPH KLEIN, RAFFI KOROGLUYAN, PAUL LOPES, MARY LOU LOPES, ABRAHAM MANJIKIAN, IMAD SALEH, WALTER STEELE, JAYED SUDDAL, ARET TOKATLIOGLU, RICHARD WALTER, GREGORY YIGITKURT, MIKE YIGITKURT and SAHIN YIGITKURT | CIVIL ACTION NO: 2:09-cv-05143 (WJM)(MF) |
| Plaintiffs, | MOTION RETURNABLE: MAY 3, 2010 |
| v. | |
| BP PRODUCTS NORTH AMERICA, INC., | |
| Defendant. | |

---

## THE ALBOYACIAN PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

---

GREENBAUM, ROWE, SMITH & DAVIS LLP
75 Livingston Avenue, Suite 301
Roseland, NJ  07068
973/535-1600
Attorneys for Plaintiffs

Of Counsel:
     Marc J. Gross, Esq.

On the Brief:
     Richard L. Hertzberg, Esq.
     Christine F. Marks, Esq.

1200560.03

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF FACTS ............................................. 3

LEGAL ARGUMENT ................................................ 6

    POINT I ................................................... 6

    BP'S MOTION TO DISMISS SHOULD BE DENIED IN ITS
    ENTIRETY. ................................................. 6

    POINT II .................................................. 7

    PLAINTIFFS STATE A VALID CAUSE OF ACTION FOR BP'S
    VIOLATION OF THE NEW JERSEY FRANCHISE PRACTICES
    ACT. ...................................................... 7

    POINT III ............................................... 19

    PLAINTIFFS STATE A CLAIM FOR BREACH OF THE
    IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
    AND BP'S MOTION SHOULD BE DENIED. ....................... 19

    POINT IV ................................................ 24

    PLAINTIFFS' STATE CLAIMS FOR FRAUD AND NEGLIGENT
    MISREPRESENTATION CLAIMS AND BP'S MOTION SHOULD
    BE DENIED. .............................................. 24

    POINT V ................................................. 32

    THE COMPLAINT CLEARLY ALLEGES A PRIMA FACIE CLAIM
    FOR TORTIOUS INTERFERENCE WITH EXISTING
    CONTRACTS. .............................................. 32

    POINT VI ................................................ 35

    PLAINTIFFS HAVE PLED VIABLE CLAIMS FOR *UNJUST*
    *ENRICHMENT* AND *QUANTUM MERUIT*. ...................... 35

        A.   Plaintiffs Have Established the
             Elements of Unjust Enrichment. ............. 38

        B.   Plaintiffs Have Established The
             Elements Of Quantum Meruit. ................ 38

i

POINT VII ............................................... 40

     PLAINTIFFS HAVE PLED A VIABLE CLAIM FOR EQUITABLE
     ESTOPPEL. ............................................... 40

CONCLUSION ................................................. 44

1200560.03

## TABLE OF AUTHORITIES

Page

### Cases

ALA, Inc. v. CCAIR, Inc.
  29 F.3d 855 (3d Cir. 1994) ................................... 6

Amerada Hess Corp. v. Quinn
  143 N.J. Super. 237 (Law Div. 1976) ........................ 10

Bak-A-lum Corp. of Am. v. Alcoa Building Products Inc.
  69 N.J. 123 (1976) ................................. 20, 22, 24

Banco Popular North America v. Gandi
  184 N.J. 161 (2005) ....................................... 24

Bell Atlantic Corp. v. Twombly
  550 U.S. 544 (2007) ........................................ 7

Berry v. Playboy Enterprises, Inc.
  195 N.J. Super. 520 (App. Div. 1984) certif. denied
  99 N.J. 231 (1985) ........................................ 31

Black Horse Lane Assoc. v. Dow Chemical Corp.
  228 F.3d 275 (3d Cir. 2000) ........................... 20, 21

BP Products North America, Inc. v. Hillside Service,
  Inc., et al.,
  Civil Action No. 2:09-cv-4210 .............................. 3

Brunswick Hills Racquet Club, Inc. v. Route 18
  Shopping Ctr. Assocs.
  182 N.J. 210 (2005) ................................... 19, 20

Caputo v. Nice-Pak Products, Inc.
  300 N.J. Super. 498 (App. Div.) ........................... 36

Carlsen v. Masters, Mates & Pilots Pension Plan Trust
  80 N.J. 334 (1979) ........................................ 43

Commerce Bancorp., Inc. v. BK Intern Ins. Brokers Ltd.
  490 F.Supp.2d. 556 (D.N.J. 2007) .......................... 30

Cooper Distributing Co., Inc. v. Amana Refrigeration,
  Inc.
  180 F.3d 542 (3d Cir. 1999) ............................... 10

iii

Del Sontro v. Cendant Corp., Inc.
   223 F.Supp.2d 563 (D.N.J. 2002) ............................ 42

Diebold, Inc. v. Continental Ins. Co.
   2008 U.S. Dist. LEXIS 29308 (D.N.J. April 10, 2008) ........ 31

Dover Shopping Ctr., Inc. v. Cushman's Sons, Inc.
   63 N.J. Super. 384 (App. Div. 1960) .................... 29, 30

Dunkin' Donuts of America, Inc. v. Middletown Donut
   Corp.
   100 N.J. 166 (1985) ....................................... 14

Emerson Radio Corp. v. Orion Sales, Inc.
   253 F.3d 159 (3d. Cir. 2000) ...................... 20, 21, 22

Erickson v. Pardus
   551 U.S. 89 (2007) ......................................... 6

Florian Greenhouse, Inc. v. Cardinal IG Corp.
   11 F.Supp.2d 521 (D.N.J. 1998) ............................ 32

Goldwell of New Jersey, Inc. v. KPSS Inc.
   622 F.Supp.2d 168 (D.N.J. 2009) ................... 10, 14, 15

Gould Elec. Inc. v. United States
   220 F.3d 169 (3d Cir. 2000) ............................... 6

Hedges v. United States
   404 F.3d 744 (3d Cir. 2005) ............................... 6

Highway Trailer Co. v. Donna Motor Lines, Inc.
   46 N.J. 442 (1966) ........................................ 41

Iliadis v. Wal-Mart Stores, Inc.
   191 N.J. 88 (2007) ........................................ 38

Instructional Systems, Inc. v. Computer Curriculum
   Corp.
   130 N.J. 324(1992) ......................................... 9

Island Realty v. Bibbo
   329 N.J. Super. 528 (App. Div. 2000) .................. 36, 41

Jewish Ctr. of Sussex Cty. v. Whale
   86 N.J. 619 (1981) ........................................ 24

Karu v. Feldman
   119 N.J. 135 (1990) ....................................... 31

iv

Kaufman v. I-Stat Corp.
  165 N.J. 94 (2000) .......................................... 25

Kehr Packages, Inc. v. Fidelcor, Inc.
  926 F.2d 1406 (3d Cir. 1991) ................................. 7

Knorr v. Smeal
  178 N.J. 169 (2003) ..................................... 42, 43

Liberty Lincoln Mercury v. Ford Motor Co.
  134 F.3d 557 (3d Cir. 1998) ................................. 10

LoBosco v. Kure Eng'g Ltd.
  891 F.Supp. 1020, 1032 (D.N.J. 1995) ....................... 27

Louisiana Counseling and Family Services, Inc. v.
  Makrygialos, LLC
  543 F.Supp.2d 359 (D.N.J. 2008) ............................ 42

Luso Fuel, Inc. v. BP Products North America, Inc.,
  Civil Action No. 2:08-cv-03947 (June 29, 2009) 1, 16, 17, 18, 27

Miller v. Miller
  97 N.J. 154 (1984) ......................................... 42

New Jersey American, Inc. v. Allied Corp.
  875 F.2d 58 (3d Cir. 1999) ................................. 17

Palatine I v. Planning Bd.
  39 N.J. 546 (1993) ......................................... 43

Power-Matics, Inc. v. Ligotti
  79 N.J. Super. 294 (App. Div. 1963) ........................ 36

Printing Mart-Morristown v. Sharp Electronics Corp.
  116 N.J. 739 (1989) ........................................ 33

Ricco v. Shell Oil
  180 N.J. Super. 399 (Ch. Div. 1981) ........................ 16

Rodichok v. Limitorque Corp.
  1997 U.S. Dist. LEXIS 9975 (D.N.J. 1997)( .................. 42

Roll v. Singh
  2008 U.S. Dist. Lexis 50125 (D.N.J. June 26, 2008) ...... 30, 31

Sarwari v. BP Products North America, Inc.,
  Civil Action No. 06-2976(DMC) .......... 2, 3, 4, 16, 17, 24, 31

Shapiro v. Solomon
  42 N.J. Super. 377 (App. Div. 1956) ........................36

Shell Oil v. Marinello
  63 N.J. 402 (1973) .........................................8

Sons of Thunder, Inc. v. Borden, Inc.
  148 N.J. 396 (1997) ........................19, 20, 21, 22, 23

Starkey, Kelly, Blaney & White v. Estate of Nicolaysen
  172 N.J. 60 (2002) .....................................38, 39

State by Parson v. United States Steel Corp.
  22 N.J. 341 (1956) ........................................41

Sustick v. Slatina
  48 N.J. Super. 134 (App. Div. 1957) ......................33

Texaco, Inc. v. Appleget
  63 N.J. 411 (1973) .........................................8

Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts
  Inc.
  140 F.3d 478 (3d Cir. 1998) ................................6

VRG Corp. v. GKN Realty Corp.
  135 N.J. 539, 554 (1994) ..................................38

Warth v. Seldin
  422 U.S. 490 (1975) ........................................6

Weichert Company Realtors v. Ryan
  128 N.J. 427 (1992) ....................................37, 39

Westfield Centre Service, Inc. v. Cities Serv. Oil Co.
  86 N.J. 453 (1981) .....................11, 12, 13, 14, 19, 34

Wilson v. Amerada Hess Corp.
  168 N.J. 236, 244 (2001) ...............................19, 20

1200560.03

**Statutes**

N.J.S.A. 56:10-1 *et seq.* ...................................... 7

N.J.S.A. 56:10-5 ........................................... 9, 12

N.J.S.A. 56:10-7(f) ....................................... 18, 37

**Other Authorities**

Restatement (Second) of Contracts
  §205 comment a (1981) ...................................... 20

**Rules**

Third Circuit Rules at IOP 5.7 ................................ 1

1200560.03

## PRELIMINARY STATEMENT

BP Products North America, Inc.'s ("BP") motion to dismiss ignores controlling precedent.  Indeed, in an effort to obtain an unwarranted dismissal of plaintiffs' meritorious complaint, BP relies on archaic and non-precedential decisions and presents a false picture of the state of the law in New Jersey.  BP's brief demonstrates why unreported decisions are not to be given any weight.[1]  For example, the case upon which BP's argument on almost every point rests, Luso Fuel, Inc. v. BP Products North America, Inc., Civil Action No. 2:08-cv-03947 (June 29, 2009), is an unpublished non-precedential decision that happens to be incorrectly decided.  That BP must rely on outmoded and/or unpublished decisions speaks to the merit, or lack thereof, of BP's arguments.

Yet BP's misstatements are not limited to the law.  BP proffers factual inaccuracies to the Court.  For example, BP suggests plaintiffs were aware that there would not be more than a twelve (12) year franchise term.  (BP moving brief at 7). While it is true that certain plaintiffs affirmed that they were at some point told they would receive a twelve (12) year term, BP fails to point out that these plaintiff declarations preceded

---

[1] See Third Circuit Rules at IOP 5.7. ("The Court by tradition does not cite to its non-precedential opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing.").

the Sarwari decision (Sarwari v. BP Products North America, Inc., Civil Action No. 06-2976(DMC)), and preceded BP's verbal and written representations of continued renewals subsequent to the Sarwari decision. Most troubling, however, on this point is that BP ignores the fact that in renewing the CMAs after the Sarwari decision, BP created terms for plaintiffs that it surely knows exceed the supposed twelve (12) year limit.[2]  See April 14, 2010 Declaration of Richard L. Hertzberg.

BP's resort to such machinations should be rejected.  This is a case where a franchisor simply seeks to steal the value and goodwill of its franchisees' businesses without paying a dime. New Jersey law, as articulated in the New Jersey Franchise Practices Act (the "Act"), and in relevant common law, will not allow BP to run roughshod over its vulnerable dealers.  On this motion to dismiss, the allegations raised by the plaintiffs in the Complaint are deemed to be true.  As this case develops, plaintiffs will prove that BP's reprehensible scheme to enrich itself by destroying its franchisees' livelihoods is, in reality, precisely as alleged by plaintiffs.  In the interim, BP's motion should be denied in all respects.

---

[2]  As detailed infra, controlling law renders irrelevant the question of whether the CMA incorporates an initial twelve (12) year term or a term of longer duration.  However, BP's penchant for presenting an incomplete picture (to be charitable) is consistent with the lack of candor BP has exhibited to its franchisees.  BP's "twelve year term" argument is not only legally irrelevant, but factually misleading.

2

## STATEMENT OF FACTS

Rather than repeat the exposition of the facts set forth in their brief in support of their motions for summary judgment in BP Products North America, Inc. v. Hillside Service, Inc., et al., Civil Action No. 2:09-cv-4210, and for partial summary judgment in Ara Alboyacian, et al. v. BP Products North America, Inc., Civil Action No. 2:09-cv-05143, plaintiffs refer to and incorporate same. However, for ease of reference, plaintiffs include herein some of the more compelling and significant facts alleged in the Complaint.

- The plaintiffs operate BP service stations pursuant to Commissioner Marketer Agreements ("CMA"). The term of the current CMAs for the various Franchisees will end between 2010 and 2013, depending on the particular plaintiff. See Complaint, ¶¶25-31.

- Under the CMA, the plaintiffs do not purchase the BP fuel they dispense. Rather, BP provides the fuel and the plaintiffs earn a commission on each gallon sold to customers. See Complaint, ¶31.

- By way of Order and Opinion dated September 15, 2006, in Sarwari v. BP Products North America, Inc., Civil Action No. 06-2976 (DMC), BP was enjoined from terminating plaintiffs' franchises and was ordered to maintain the status quo. See Complaint, ¶44.

3

- By way of letter to the Court dated October 25, 2006, in connection with the Sarwari v. BP Products North America, Inc., Civil Action No. 06-2976 (DMC), matter, BP represented that it would not withdraw the CMA channel of trade in New Jersey. ("BP no longer has plans to withdraw the Commissioner Marketer channel of trade in New Jersey."). See Complaint ¶46, Declaration of Richard L. Hertzberg ("Hertzberg Decl."), Exhibit B.

- Subsequently, plaintiffs entered renewal Commission Marketer Agreements ("CMA Renewals") for additional four year terms. See Complaint, ¶47.

- In connection with the CMA Renewals, BP representatives, including Anne Hauk and Anthony Cyriac, advised plaintiffs that BP would again renew the CMA at the end of the renewal term. See Complaint, ¶48.

- The plaintiffs have made substantial investments of money, time and effort in their BP service station businesses. See Complaint, ¶10; ¶58.

- On or about September 18, 2009, BP advised that it would not renew any CMAs at the conclusion of their respective terms. See Complaint, ¶59.

4

- In the course of this announcement, BP advised that its strategy in this regard is designed to circumvent the Court's 2006 ruling, barring BP from terminating the CMA agreements.  <u>See</u> Complaint, ¶60.

- BP has not advised any plaintiff that he or she is in breach of the CMA.  <u>See</u> Complaint, ¶61.

1200560.03

## LEGAL ARGUMENT

### POINT I

### BP'S MOTION TO DISMISS SHOULD BE DENIED IN ITS ENTIRETY.

Motions to dismiss are disfavored and should be granted sparingly and cautiously and then only where it appears to a certainty that no set of facts could be proven which would entitle plaintiff to any relief. ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (Dismissal is appropriate only if after accepting all allegations as true and drawing all inferences in plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations). In deciding a motion to dismiss, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998).

It is axiomatic that "[o]n a motion to dismiss for failure to state a claim, the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs, and determining whether they state a claim as a matter of law." Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)(citing Gould Elec. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000). See also, Erickson v. Pardus, 551 U.S. 89, 93-94 (2007).

6

It is equally well settled that the defendant bears the burden of showing that no claim has been presented. Id. (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). So long as the allegations of a complaint demonstrate a "plausible entitlement to relief" dismissal is inappropriate. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Here, BP cannot meet its heavy burden of showing that plaintiffs' claims fail as a matter of law, and its motion must be denied.

There can be no doubt that plaintiffs plead substantial factual allegations that support all claims in their Complaint, and all of plaintiffs' factual allegations must be accepted as true for purposes of defeating BP's motion. Clearly, the factual scenario pled by plaintiffs constitutes a firm foundation for plaintiffs' causes of action. Unquestionably, BP's motion to dismiss on the pleadings should be denied in all respects.

### POINT II

**PLAINTIFFS STATE A VALID CAUSE OF ACTION FOR BP'S VIOLATION OF THE NEW JERSEY FRANCHISE PRACTICES ACT.[3]**

Ignoring the plain language of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq.(the "Act"), and in brazen disregard for the overwhelming weight of contrary

---

[3] For a further discussion of plaintiffs' claims under the Act, see Plaintiffs' Brief in Support of Motion for Summary Judgment/Partial Summary Judgment at pages 15-27.

7

authority, BP argues in essence that the Act affords a franchisee no greater protection than that found within the four corners of a contract. Otherwise stated, BP asserts that the protections of the Act extend only to the end of the current CMA term. Not surprisingly, BP's implausibly narrow interpretation of the Act is contrary to public policy, the Act and to holdings of the New Jersey Supreme Court and the Third Circuit.

Indeed our Supreme Court has held that New Jersey's public policy "restricts the unilateral right of an oil company to...**fail** **to** **renew** a lease and dealer agreement with one of its service station operators to a situation where 'good cause' for such action exists." Texaco, Inc. v. Appleget, 63 N.J. 411, 412 (1973)(emphasis added). Undeniably, this policy affords the franchisee with protection extending beyond the CMA term. It protects the right to renew as well.[4]

---

[4] In Shell Oil v. Marinello, 63 N.J. 402 (1973), involving a contractual relationship between a gas station operator and the oil company entered into prior to the effective date of the NJFPA, the New Jersey Supreme Court, relying upon public policy, ruled despite the clear and unambiguous language of the contracts permitting non-renewal, that the parties' relationship "would have legal existence for an indefinite period, subject to his substantially performing his obligations thereunder." Id. at 411. In so ruling, the Court stated:

> public policy requires that there be read into the existing lease and dealer agreement, and all future lease and dealer agreements which may be negotiated in good faith between the parties, the restriction that Shell not have the unilateral right to

8

This policy and its "good cause" requirement is codified in the Act.  Indeed, the Act was "prompted in large measure by the unfair practices of...major oil companies" toward their franchisees.  Instructional Systems, Inc. v. Computer Curriculum Corp., 130 N.J. 324, 340 (1992) (emphasis added).

The Act, by its express terms, restricts the franchisor's ability to end and/or not renew a franchise relationship without consequence.  Under New Jersey law, only where the franchisor can establish "good cause" is it free to terminate a franchise relationship without further obligation.  Thus, the Act provides:

> It shall be a violation of this act for a franchisor to terminate, cancel or *fail to renew a franchise* without good cause.  For purposes of this act, *good cause for* terminating, canceling, or *failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise*.

N.J.S.A. 56:10-5 (Emphasis added).

Courts recognize that the Act's underlying purpose is to protect New Jersey franchisees from the loss of their

---

> terminate, cancel or fail to renew the franchise, including the lease, in absence of a showing that Marinello has failed to substantially perform his obligations under the lease and dealer agreement, i.e., for good cause.

Id. at 411.

9

investments in the business and from the loss of the value and goodwill they created in the franchise.  See Goldwell of New Jersey, Inc. v. KPSS Inc., 622 F.Supp.2d 168, 191 (D.N.J. 2009). The remedy afforded a franchisee whose relationship is not renewed (absent good cause), is an award of compensation equal to the fair value of the franchise, less the value of assets that could be liquidated by the franchisee.  Cooper Distributing Co., Inc. v. Amana Refrigeration, Inc., 180 F.3d 542, 547 (3d Cir. 1999).

To achieve its remedial goal, the plain language of the Act is unambiguous and should be read liberally.  See Liberty Lincoln Mercury v. Ford Motor Co., 134 F.3d 557, 566 (3d Cir. 1998)(the Act is a remedial statute and must be read liberally). A franchisor cannot refuse to renew a franchise without consequence unless "good cause" exists, meaning that the franchisee has failed to substantially perform its obligations under the franchise compact.  Amerada Hess Corp. v. Quinn, 143 N.J. Super. 237, 250 (Law Div. 1976).  BP does not allege any breach by any franchisee as justification for ending the franchise relationship.

Rather, BP argues that the plaintiffs cannot maintain a cause of action under the Act because BP intends to terminate the relationship in accordance with the contract's express terms.  This precise argument has been considered and roundly

10

rejected by the New Jersey Supreme Court in Westfield Centre Service, Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 469 (1981).

In Westfield, the New Jersey Supreme Court addressed, head on, the right of a franchisor to refuse to renew a franchise agreement that was to expire in accordance with its express terms. In Westfield, the franchisor, Cities Service, notified the franchisee station operator that "the lease and other agreements, **all expiring by their terms on April 30, 1976, would not be renewed.**" 86 N.J. at 458 (Emphasis added). The franchisee filed suit, claiming that the failure to renew the relationship violated the Act.

The franchisor defended the action claiming a bona fide, good faith, basis for its refusal to renew the relationship. The franchisor alleged that it ended the relationship because the gasoline station at that location was not economically feasible, and because of its determination that it was over-invested in real estate. Id. at 459-60. Thus, the company maintained it had a good faith economic reason for terminating the franchise. Id. at 467. The company argued that such "good faith" termination in accordance with controlling contractual terms would not violate the Act and would not require payment of any compensation to the franchisee. Id.

In rejecting the franchisor's argument, the Supreme Court explained why BP's instant motion must fail.

11

> [A] franchisor who in good faith and for a
> bona fide reason terminates, cancels **or
> fails to renew a franchise** for any reason
> other than the franchisee's substantial
> breach of its obligations has violated
> N.J.S.A. 56:10-5 and **is liable to the
> franchisee for the loss occasioned thereby,
> namely the reasonable value of the business,
> less the amount realizable on liquidation.**

86 N.J. at 469. (Emphasis added).

The New Jersey Supreme Court further dismissed the franchisor's argument, which is the very same argument proffered by BP, that the Act did not require renewal because the contracts terminated pursuant to their express terms. The Westfield court's rejection of the argument here advanced by BP warrants exposition.

> The Legislature amended the bill to conform
> with the Governor's suggestions. **One
> striking fact which emerges is the intent
> that a franchisor could not sever the
> relationship with its franchisee without
> good cause.** Moreover, the section then
> defines good cause in terms of the
> franchisee's failure to substantially comply
> with the requirements placed upon him in the
> franchise agreement. **The plain meaning of
> the language, supported by the legislative
> history, sharply curtails a franchisor's
> right to end the franchise in the absence of
> a breach by the franchisee.** Thus when the
> franchisee has complied with the terms of
> the agreement **the franchisor does not
> possess an unrestricted authority to close
> out the arrangement in accordance with its
> terms.**
>
> The legal effect of the restriction in
> section 5 may not be considered in a vacuum.
> Rather, it must be related to the nature and

12

extent of the remedy provided in section 10. Section 10 entitles a franchisee "to recover damages sustained by reason of any violation of this act and, where appropriate, . . . to injunctive relief." **Thus, despite the terms of the agreement, the franchisor may not refuse, at least under some circumstances [ a showing of good cause], to continue the franchise unless it reimburses the franchisee for its loss.** Limiting our consideration to the situation in which the franchisor acts in good faith for a bona fide reason, the damages should be measured, as the trial court stated, in terms of the actual or reasonable value of the franchisee's business when the franchisor cuts off the franchise. See 158 N.J. Super. at 481. **Restoration of the loss accords with the legislative desire to protect the innocent franchisee when the termination occurs at the franchisor's convenience.**

86 N.J. at 465-46 (emphasis added).

In fact, the New Jersey Supreme Court unequivocally decreed that the "effect of the Act has been **to add another provision in the franchise agreements concerning refusals to extend the terms and compensation to the franchisee in the event of those refusals.**" Id. at 467 (emphasis added). Indeed, under the clear and unambiguous law of New Jersey - as determined by its Supreme Court - the **"closing of a franchise is conditioned on the payment of compensation"** to a non-breaching franchisee. Id. (Emphasis added).

BP argues that the Act should not be interpreted to mean that a franchisee is entitled to repeated renewals of the CMA.

13

However, absent a franchisee breach, this is <u>precisely</u> what the
Act contemplates:

> [u]pon signing the franchise agreement, both
> franchisor and franchisee are aware of the
> rules of the game.  Those rules seem fair.
> With the advent of the New Jersey Franchise
> Practices Act, **once a franchise relationship
> begins**, all that a franchisee must do is
> comply substantially with the terms of the
> agreement in return for which **he receives
> the benefit of an "infinite" franchise - he
> cannot be terminated or refused renewal.**

<u>Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.</u>, 100
<u>N.J.</u> 166, 185 (1985)(emphasis added).  Despite BP's best efforts
to obfuscate, however, plaintiffs do not contend that BP can
never end a franchise relationship.  BP certainly can terminate
the franchise relationship with its non-breaching franchisees at
any time, **but only** if it pays each of them fair compensation for
their businesses.  <u>See</u> <u>Westfield</u>, 86 <u>N.J.</u> at 467.

Recently, the District Court affirmed these basic tenets of
New Jersey franchise law.  In <u>Goldwell</u>, <u>supra</u>, 622 <u>F.Supp.</u>2d
168, a case with facts strikingly similar to those here, the
parties had entered into a series of "Regional Buying
Agreements" ("RBAs"), where the plaintiff sold the defendant
manufacturer's products.  <u>Id.</u> at 171.  The RBAs provided the
franchisor with the "unfettered discretion" to renew, or not
renew, the parties' relationship.  <u>Id.</u>  In 2007, the franchisor,
KPSS, provided notice to the plaintiff that it had decided not

14

to continue or renew the RBAs, and that they would expire by
their terms on December 31, 2007. Id.  Upon receiving notice of
the franchisor's intent to forego renewal of the RBAs, the
franchisee, like plaintiffs here, brought suit.  Id.

On motions for summary judgment, the District Court stated:

> [T]he NJFPA does not prohibit all failures
> to renew a franchise agreement; the statute
> permits a franchisor to forego renewal when
> it has "good cause" to do so.

622 F.Supp.2d at 187-88.

Although the Goldwell Court denied the motions for summary
judgment, based on a fact issue regarding the franchisee's
substantial compliance with the terms of the franchise
relationship, the Court reiterated that the clear purpose of the
Act is to "protect franchisees who have invested substantial
capital in furthering a franchise."  622 F.Supp.2d at 191.

Here, BP's stated refusal to renew is inconsistent with the
Act as BP concedes it lacks the required "good cause."  Here,
like the Goldwell franchisor, that BP seeks to end the CMA at
the conclusion of the contract's term is of no moment.  Clearly,
if BP seeks to terminate the Franchisees for reasons other than
the statutorily defined "good cause," it may do so, but a
prerequisite is the payment of just compensation.

In this case, there are no allegations that the Franchisees
are in breach of their CMA obligations.  Thus, as a matter of

15

law, BP either must renew the CMAs, or pay appropriate compensation to the Franchisees.

BP's almost exclusive reliance upon the unpublished non-precedential District Court decision in Luso, for a contrary conclusion, is misplaced.    In that case, Judge Cavanaugh permitted BP to exercise a contractual right to terminate a CMA prior to the end of its term due to non-renewal of an underlying ground lease.   Although Judge Cavanaugh recognized the statutory definition of good cause, and approved of Sarwari, he erred in ruling that that the CMA's provision permitting termination in the event of the expiration of the ground lease between BP and a third party landlord distinguished Luso from Sarwari.

BP's determination in Luso not to renew its ground lease with the third party landlord, effectively ending the franchise, clearly was a business decision and should have triggered a duty to pay compensation under the Act.   In mistakenly upholding BP's right to terminate without further obligation, the Luso court inexplicably chose to follow the logic of a New Jersey state trial court decision applying a less protective statute, the federal Petroleum Marketer Practice Act ("PMPA"), which BP concedes does not apply here.[5]   Plaintiffs respectfully submit

---

[5] The Luso Court relied upon a Chancery Division case from 1981, decided under the federal PMPA, not the Act.   Ricco v. Shell Oil, 180 N.J. Super. 399 (Ch. Div. 1981).   The PMPA provides far less protection to a franchisee than the Act, and, in fact

16

that to the extent Luso is at all applicable, which it is not, it was incorrectly decided.[6]

Significantly, in finding that BP could terminate Luso pursuant to the bare terms of the CMA, the Luso Court ignored not only the New Jersey Supreme Court's holdings on this issue, but also overlooked the law in this Circuit. The Third Circuit has unambiguously stated that the Act creates **"an exception to the general rule that two businesses are free to terminate their business relationship in accordance with the terms of their contract."** New Jersey American, Inc. v. Allied Corp., 875 F.2d 58, 61 (3d Cir. 1999)(Emphasis added).

Further, the Luso decision is at odds with the Act's specific function of voiding any contractual term contrary to its goals and policies. The Act makes clear that "[i]t shall be a violation of this Act for any franchisor...to provide any term

---

permits termination\non-renewal in certain enumerated circumstances. See Sarwari at 10. Hertzberg Decl., Exhibit A. BP has conceded that the Act -- and not the PMPA -- governs the parties' CMA relationship in this case.

[6] Only seven (7) of the Franchisees have businesses on properties subject to a third party lease. As is evidenced by BP's offer to sell its leasehold interests to these plaintiffs, unlike the Luso plaintiff, any Franchisee subject to a third party lease has a CMA that expires prior to the conclusion of the lease term. See Alboyacian Decl., Exhibit D. Thus, on its facts, Luso is distinguishable from the instant scenario even as to those plaintiffs subject to a third party lease. But even if all the Franchisees' situations mirrored those of the Luso plaintiff, Luso's rationale should be rejected as it is inconsistent with the body of NJFPA jurisprudence on the subject.

17

in any lease or other agreement ancillary or collateral to a franchise which term or condition directly or indirectly violates this Act," N.J.S.A. 56:10-7(f). Unquestionably, the Act trumps any CMA provision inconsistent with its remedial purpose. Thus, a CMA term purporting to permit termination/non-renewal for any reason other than franchisee breach is unenforceable.

The unpublished decision in Luso stands in the shadow of state and federal court precedent regarding the application and operation of the Act. The cases discussed above firmly establish that regardless of the terms of the franchise compact, the Act will not permit a franchisor to forego renewal and end the franchise relationship absent a demonstration that the franchisee did not substantially comply with the terms of the franchise relationship. So long as the franchisee has not breached the CMA, a payment of just compensation must accompany BP's withdrawal from the relationship.

If BP determines that it does not wish to renew the plaintiffs for business reasons, it must pay compensation to each and every one of the plaintiffs. That compensation is measured as the reasonable value of each business.

In New Jersey, the bare language of the CMA is not the sole measure of the parties' rights and duties. BP cannot avoid the fact that New Jersey law imposes a superseding obligation, in

18

effect "another [CMA] provision" requiring BP to renew the CMAs, or compensate the plaintiffs. Westfield, 86 N.J. at 467. BP's construction of the Act reduces the protections of the Act to little more than a modified remedy for a breach of contract. The cases firmly establish that the Act's protections go far beyond the franchisee's rights under the four corners of the contract. It protects the continued existence of the franchise relationship and the value of the plaintiffs' contribution to that relationship.

Clearly, then, plaintiffs have articulated a valid cause of action sounding in violation of the Act and BP's motion to dismiss Count One of plaintiffs' complaint should be denied.

### POINT III

**PLAINTIFFS STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND BP'S MOTION SHOULD BE DENIED.**

The covenant of good faith and fair dealing exists in every contract. See, e.g., Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 214 (2005); Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396 (1997). The covenant provides that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive fruits of the contract...." Wilson, 168 N.J. at 245 (citing Sons of Thunder, Inc., 148 N.J. at 421).

19

Stated differently, "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Brunswick Hills Racquet Club, Inc., supra, 182 N.J. at 224 (citing Restatement (Second) of Contracts §205 comment a (1981)).

Contrary to BP's misstatement of the law, the New Jersey Supreme Court has decreed that even the exercise of an absolute contractual right is subject to considerations of good faith. See Sons of Thunder, 148 N.J. at 423-424; Bak-A-lum Corp. of Am. v. Alcoa Building Products Inc., 69 N.J. 123 (1976). See also, Wilson v. Hess, 168 N.J. 236 (2001) (Hess Oil's unilateral contractual right to set prices for franchisees is subject to the covenant of good faith and fair dealing). The Third Circuit concurs. See Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 170 (3d. Cir. 2000) (Under New Jersey law, a party to a contract can breach the implied duty of good faith even if that party abides by the express and unambiguous terms of that contract if that party "acts in bad faith or engages in some other form of inequitable conduct.") (quoting Black Horse Lane Assoc. v. Dow Chemical Corp., 228 F.3d 275, 288 (3d Cir. 2000)).

BP's suggestion that the duty of good faith and fair dealing applies only where a contract has been breached simply is not the law in New Jersey. In fact, BP relies upon New

20

Jersey and District Court case law decided **prior to** the New Jersey Supreme Court's ruling in <u>Sons of Thunder</u> and **prior to** the Third Circuit's rulings in <u>Emerson</u> and <u>Black Horse</u>. Unable to proffer any precedential authority, BP has no choice but to fall back on unpublished District Court cases. <u>See</u> *e.g.* BP's brief at 18-19. BP's outmoded and irrelevant authority bears little relation to the current state of the law. Pertinent decisions confirm the validity of plaintiffs' claim sounding in breach of the duty of good faith.

In <u>Sons of Thunder</u>, Defendant Borden contracted to purchase clam meat from plaintiff for five years. The contract permitted Borden to terminate in a year, but it was plaintiff's expectation that the contract would run for the five year term. After one year, Borden, with new managers, terminated the contract. Plaintiff sued, alleging, among other things, breach of the covenant of good faith and fair dealing.

The jury found that the defendant had not breached the terms of the agreement, but nonetheless found defendant liable for breach of the covenant of good faith and fair dealing. In upholding the jury verdict, the New Jersey Supreme Court found that a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations, **even when it exercises an express and unconditional contract right**. <u>Sons of Thunder</u>, 148 <u>N.J.</u> at 422-423 ("a party can violate the

21

implied covenant of good faith and fair dealing without violating an express term of a contract").

In Bak-A-lum, the New Jersey Supreme Court held that a defendant's withholding from plaintiff of its intention to seriously impair its distributorship, although knowing plaintiff was embarking on a investment substantially predicated upon its continuation, constituted a breach of the implied covenant of dealing in good faith. The Bak-A-lum court noted that keeping this "secret intent," from the plaintiff, who was relying on the contract's continuation, constituted bad faith. Id. at 130. See also, Emerson, 253 F.3d 159 (even though defendant exercised rights within the four corners of the contract, failure to disclose contemporaneous intent to change the relationship constitutes bad faith).

Here, as in Sons of Thunder, Bak-A-lum and Emerson, BP was aware that in making investments and in taking steps to expand the BP business, plaintiffs were relying on BP's assurances of an ongoing franchise relationship. Significantly, BP not only assured plaintiffs of a continued relationship, but assured plaintiffs, in writing, that BP's representations should be trusted.

The "Ethics Certification" signed by BP and provided to its franchisees as part of the franchise package plainly was designed to encourage plaintiffs to believe they were in a

22

"trusting" relationship, where representations *should* be relied upon.

> 1. BP is a company committed to respecting the rule of law and **conducting business with integrity.** This includes **acting ethically** with regard to every aspect of operations.
>
> 2. **BP's relationships** with our business **partners [plaintiffs] are founded on trust**, respect for human dignity and the rights of others in every aspect of operations.

See Declaration of Aret Tokatlioglu ("Tokatlioglu Decl."), Exhibit A (Emphasis added).[7] Clearly, the plaintiffs here had no reason to distrust BP.

Accordingly, as in Sons of Thunder, and as pled in the Complaint at ¶¶84-90, plaintiffs trusted BP, and made investments based on BP's assurances of a continued CMA franchise. As a result, plaintiffs have had their financial reality turned upside down by BP's clever but unlawful manipulation of the CMA relationship. Plainly, BP seeks to deprive plaintiffs of the fruits of their contract. The instant case presents a classic violation of the covenant of good faith and fair dealing.

BP encouraged plaintiffs to invest substantial monies in the purchase of new stations and/or in improving their

---

[7] This appears to have been provided as part of the franchise packages delivered to plaintiffs. Additional "Ethics Certification" from other plaintiffs can be provided at the Court's request.

facilities.    These assurances were made in the context of a "trusting" relationship while BP actually harbored a "secret intent" (Bak-A-lum, 69 N.J. at 130) to circumvent the holding in Sarwari, and terminate the franchise relationship.

In light of the BP's alleged conduct - which must be taken as true - and the relevant legal standard, plaintiffs have pled a valid cause of action for breach of the covenant of good faith and fair dealing.  Accordingly, BP's motion to dismiss Count Two of plaintiffs' complaint should be denied.

### POINT IV

**PLAINTIFFS' STATE CLAIMS FOR FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS AND BP'S MOTION SHOULD BE DENIED.**

A fraud claim requires a showing of the following five elements: (1) material misrepresentation of a presently existing fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance by the other person; and (5) resulting damages.    See Banco Popular North America v. Gandi, 184 N.J. 161, 172-73 (2005); Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619 (1981).

A claim for negligent misrepresentation requires a similar showing.  A claim for negligent misrepresentation must demonstrate an "incorrect statement, negligently made, and justifiably relied on" resulting in economic loss.    See Kaufman

24

v. I-Stat Corp., 165 N.J. 94 (2000).  The difference between the
two claims is intent.

Here, plaintiffs have alleged that in connection with the
CMA Renewals, territory manager Anne Hauk and/or Anthony Cyriac
falsely advised plaintiffs, both over the telephone and in
person, that BP would maintain the CMA relationship after the
end of the renewal term.  Complaint, ¶48; ¶94.  Worse still, by
correspondence of October 25, 2006, BP represented to the Court
(and plaintiffs) that it would not end the CMA relationship in
New Jersey.  ("BP no longer has plans to withdraw the Commission
Marketer channel of trade in New Jersey, and BP will abide by
the law in its continued operation of the Commission Marketer
channel of trade in New Jersey").  Id., ¶44; Hertzberg Decl.,
Exhibit B.

Plaintiffs further allege that these representations were
material misrepresentations made for the purpose of inducing
entry into the CMA and/or the CMA Renewals and to induce
plaintiffs to continue to invest in the BP franchises.  Id.,
¶92; ¶101.  In reliance on BP's representations, plaintiffs not
only continued the CMA relationship, but made additional
investments in their various franchises.  Id., ¶96.

In trying to obtain an unwarranted dismissal of plaintiffs'
well pled fraud and negligent misrepresentation claims, BP
argues that its misrepresentations are immaterial because the

25

subsequently entered CMA Renewals contain an integration clause. Therefore, according to BP, there could have been no justified reliance by plaintiffs on representations of continued renewals in the face of a right to terminate incorporated in the CMA Renewal. BP's argument misses the mark.

Plaintiffs' allegations relate to representations made by BP before the parties entered into any renewal of the CMAs. Plaintiffs claim they were fraudulently induced to enter the agreements with BP and to continue to invest. [Complaint ¶¶92-98 & 105]. That BP perpetuated its ruse during the CMA Renewal period does not exonerate BP, especially where the renewal and plaintiffs' investments were induced by false promises not about contract terms, but of a continued relationship. Indeed, the inconsistency between BP's representations and its subsequent manipulation of the CMA Renewal underscores the strength of plaintiffs' claims.

In this regard, it is fundamental that a claim for fraud in the inducement is separate from any contract claim and it certainly arises separately from the agreement itself. See Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369 (App. Div. 1991). In recognition of this principle, courts also allow parole evidence to prove claims for fraud in the inducement because the evidence is not offered to refute any written terms of a contract, but rather to "prosecute a separate

26

action predicated upon the fraud." See Ocean Cape, 63 N.J.
Super. 369.

For purposes of this motion, plaintiffs' allegation of
fraud in the inducement is determinative. BP argues for
dismissal on the theory that plaintiffs' claims rely on
impermissible parole evidence barred by the CMA Renewal's
integration clause. Plaintiffs allege, however, that they were
induced to make the very decision to enter into the CMA Renewal
and to continue to invest in the franchise relationship based
upon inaccurate and misleading statements by BP's
representatives. Complaint, ¶¶92-98; ¶105. Clearly,
plaintiffs' fraudulent inducement claim stands alone as separate
and is not subsumed by any contract. See Ocean Cape, supra, see
also LoBosco v. Kure Eng'g Ltd., 891 F.Supp. 1020, 1032 (D.N.J.
1995) (courts have continued to affirm "the conceptual
distinction between a misrepresentation of a statement of intent
at the time of contracting, which then induces detrimental
reliance on the part of the promisee, and the subsequent failure
of the promisor to do what he has promised."). BP offers no
factual or legal basis for dismissal of these causes of action
sounding in fraudulent inducement.[8]

---

[8] BP also relies on Luso in support of its argument that
plaintiffs' fraud claim should be dismissed because it relates
to a failure to perform contractual terms only. (BP Brief at
20). Luso, however, does not address fraudulent inducement to

27

BP's further argument that plaintiffs, as a matter of law, could not have reasonably relied upon BP's assurance is equally flawed.    First  and  foremost,  the  parties'  relationship  is governed  by  the  Act.    As  set  forth  above,  once  a  franchise relationship  is  commenced  in  New  Jersey,  it  can  only  be concluded upon the payment of compensation or a finding of good cause.   By letter to the Court of October 25, 2006, BP promised to adhere to this interpretation of the law, which requires an ongoing CMA relationship, absent good cause.    See Complaint, ¶95.  BP representatives made the  same  verbal  representations. Id.,  ¶94.    Undeniably,  it  was  eminently  reasonable  for  the plaintiffs to rely upon BP's promise to continue to renew the relationship.

Unquestionably,  plaintiffs  had  no  reasonable  basis  to believe  that  BP,  at  the  same  time  it  promised  an  ongoing relationship,  would  secretly  search  for  pretexts  to  breach  that promise.    BP's subterfuge is especially deplorable in light of those  documents    disseminated  by  BP  to  plaintiffs  that  were designed  to  foster  an  expectation  of  trust.    As  noted,  BP presented  plaintiffs  with  a  signed  "Ethics  Certification," whereby BP represented to the plaintiffs that their relationship was "founded on trust," and that BP is "committed to respecting

---

enter  the  CMA  Renewal  or  to  invest  in  the  franchise
relationship.   Here, fraud in the inducement rests at the heart
of plaintiffs' fraud and negligent misrepresentation claims.

28

the rule of law and conducting business with integrity."
Tokatlioglu Decl., Exhibit A.[9]   Certainly, plaintiffs were
justified in believing BP's representations to them, and to the
Court.

BP's reliance upon Dover Shopping Ctr., Inc. v. Cushman's
Sons, Inc., 63 N.J. Super. 384 (App. Div. 1960), for the
proposition that "parole evidence may not be used to prove fraud
when the alleged fraudulent misrepresentations were directly and
specifically contradictory to the express terms of the written
agreement" (BP's brief at 22) is misplaced and misleading.   In
fact, this "authority" relied upon by BP in its brief is merely
a recitation of a "theory" advanced by the plaintiff in that
case, which was rejected by the Court.   Id. at 390.

The Dover court specifically found that "[t]here can be no
question that parol evidence is admissible to establish that the
execution of a contract was procured by fraud, notwithstanding a
provision that no representations had been made except for those
set forth in the agreement," and further stated that "[f]raud
may always be shown by parol evidence."   Id. at 390.   (Emphasis
added).

_____

[9] Although the question of whether a special relationship (BP
moving brief pp.24-26) is a requirement for a negligent
misrepresentation claim with respect to contract terms is
immaterial to plaintiffs' fraudulent inducement claim, the
existence of such a "special relationship" is amply supported by
BP's written memorialization of the parties' supposed trusting
relationship. See Tokatlioglu Decl., Exhibit A.

29

The defendant's fraud claim in Dover was dismissed, not because the alleged misrepresentations contradicted the express terms of the contract, but because the defendant failed to present any evidence that there was a misrepresentation of the promisor's state of mind or intent at the time the representations were made. Id. at 391. As such, the court properly dismissed the claim because "[f]ailure to keep such promises, even if made, would not without more, constitute fraud." Id. Plainly, BP intended plaintiffs to rely on a statement of present intent.

BP advances a similarly disingenuous argument in suggesting that any negligent misrepresentation claim must fail because the CMAs sets forth the parties' rights and obligations. (Relying upon Roll v. Singh, 2008 U.S. Dist. Lexis 50125 (D.N.J. June 26, 2008)). BP fails to acknowledge that the decisions it relies on for this proposition are premised on the existence of equal bargaining power between the parties. In Roll, for example, the District Court specifically recognized that a negligent misrepresentation claim can be dismissed due to existence of contract only where the contracting parties are of equal and "substantial" bargaining power. Id. at 64-65, citing Commerce Bancorp., Inc. v. BK Intern Ins. Brokers Ltd., 490 F.Supp.2d. 556 (D.N.J. 2007) (holding no negligent misrepresentation claim lies when a "dispute involves two parties to a contract, who

30

negotiated at arms length" and no duty of care existed).  In
Roll, only after finding that the plaintiffs had "substantial"
bargaining power, did the court rule that the negligent
misrepresentation claim did not lie.  The court in Diebold, Inc.
v. Continental Ins. Co., 2008 U.S. Dist. LEXIS 29308 (D.N.J.
April 10, 2008), also relied upon by BP, found that the
contracting parties each had "substantial" bargaining power.
Here, it is obvious that only BP has substantial bargaining
power.

A party also may be liable for negligent misrepresentation
for failing to provide accurate information that it has a duty
to disclose.  See Karu v. Feldman, 119 N.J. 135, 148 (1990); see
also Berry v. Playboy Enterprises, Inc., 195 N.J. Super. 520
(App. Div. 1984) certif. denied 99 N.J. 231 (1985).  Here, BP
had a duty in the law to disclose to its franchisees its intent
not to comply with the Sarwari ruling, and its intent to not
renew the CMAs, despite the contrary representations of its
representatives.  The duty to disclose was particularly strong
in light of BP's own documents touting the "trust" between the
parties.  As set forth in the Complaint, far from honoring its
representations, BP violated its duty to disclose, instead
choosing to disseminate false information.

In light of such well pled facts, plaintiffs have alleged
the requisite elements of actions sounding in fraud and

31

negligent misrepresentation. Accordingly, BP's motion to dismiss Counts Three and Four of the complaint on the pleadings should be denied.

**POINT V**

**THE COMPLAINT CLEARLY ALLEGES A PRIMA FACIE CLAIM FOR TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS.**

A prima facie claim for tortious interference with contractual relations requires a showing that: (1) there was an existing contract; (2) the defendant knew of the contract; (3) the defendant wrongfully interfered with that contract; (4) it is reasonably probable that the loss of the contract was a result of the interference; and (5) damages resulted from the interference. See Florian Greenhouse, Inc. v. Cardinal IG Corp., 11 F.Supp.2d 521 (D.N.J. 1998).

The Complaint plainly alleges that plaintiffs have existing contracts directly related to the operation of their motor fuel service stations, all of which have been effected by BP's misconduct. (Plaintiffs have "agreements with certain service providers, customers, employees and financial institutions."). (Complaint ¶112). Obviously, BP is aware that its franchisees maintain such contractual relationships in running a service station.

To justify its meritless motion, BP suggests that whether its behavior was "wrongful" or "intentional," can be decided as

32

a matter of law.   Putting aside the overwhelming evidence of
BP's reprehensible conduct, the definition and application of
the term "wrongful", is a question of fact for a jury.   Wrongful
conduct in the context of tortious interference has been
described as:

> both injurious and transgressive of
> generally accepted standards of law.... In
> other words, was the interference by the
> defendant sanctioned by the rules of the
> game.... There can be no tighter test of
> liability in this area than that of the
> common conception of what is right and just
> dealing under the circumstances. Not only
> must defendant's motives and purpose be
> proper but so also must be the means.

Sustick v. Slatina, 48 N.J. Super. 134, 144 (App. Div. 1957),
overruled sub silentio on other grounds, Printing Mart-
Morristown v. Sharp Electronics Corp., 116 N.J. 739 (1989).

Similarly, in assessing "malice" as a component of the
tort, the Court "must be flexible and must focus on a
defendant's actions in the context of the case presented."
Printing Mart, 116 N.J. at 751.   "[M]alice is not used in the
literal sense requiring ill will toward [a] plaintiff....
Rather, malice is defined to mean the harm was inflicted
intentionally and without justification or excuse."   Id. at 751
(citations omitted).

Here, plaintiffs allege that BP acted with intent and
knowledge of the effects of its determination not to renew the

33

CMAs. See Complaint, ¶¶112-115. There can be no justification for BP's wrongful conduct. As set forth above, nothing in the CMA Renewal excuses BP's scheme to "pull the rug out" from under the plaintiffs after repeated assurances of a continued "trusting" relationship that invited further investment. It is evident that BP's tortious conduct was willful, intentional and done with malice, taken for the purpose of enriching itself at plaintiffs' expense. Complaint, ¶115.

As previously argued herein, BP does not have the "contractual" right to end the CMA relationship in the manner it proposes. See argument, supra, Point II. The Act "adds" a superseding provision to the CMA, requiring renewal or payment of compensation unless good cause (as defined in the Act) is established. See Westfield, 86 N.J. at 467. BP seeks to grab the goodwill created by plaintiffs without paying any compensation. This violates the Act and those common law principles addressed herein. To say BP is justified in its course of conduct is simply implausible and unbelievable. BP's argument that "malice" does not exist should be rejected outright and its motion to dismiss denied.

Even if BP were not in violation of the Act, that it pursued its secret scheme to end the franchises -- while plaintiffs made investments as invited -- cannot be considered anything other than bad faith and wrongful conduct. At a

34

minimum, BP acted with knowledge that its scheme would terminate the franchises, thereby destroying those business relationships that it encouraged plaintiffs to develop.

Plaintiffs' complaint satisfies each element of the cause of action for tortious interference.  Thus, BP's motion to dismiss Counts Five and Six of the complaint on the pleadings should be denied.

### POINT VI

#### PLAINTIFFS HAVE PLED VIABLE CLAIMS FOR *UNJUST ENRICHMENT* AND *QUANTUM MERUIT*.

BP asserts that plaintiffs cannot pursue claims sounding in unjust enrichment and *quantum meruit* because these actions cannot co-exist with an express contract concerning the same subject matter.  In so arguing, BP conveniently fails to focus on the specific nature of the allegations advanced and the relief sought by plaintiffs.  Analysis of the actual facts and claims asserted demonstrates that BP's arguments should be rejected.

BP fails to perceive that plaintiffs do not seek recovery under the terms of a contract.  Indeed, no breach of contract is alleged.  Rather, plaintiffs seek recovery of the value created in the franchise by virtue of their investment in their service stations.  Plaintiffs neither seek a recovery under a contract, nor do the damages relate to the terms of any contract.  By

35

seeking to conclude the franchise contract, BP will unjustly enrich itself by appropriating the value and goodwill created by plaintiffs. In that respect, the unjust enrichment claim is a common law mirror of claims under the Act. Simply stated, BP must pay just compensation if it ends the relationship.

Moreover, under New Jersey Law, plaintiffs can assert alternative claims for breach of contract and quantum meruit where the express contracts are deemed to be unenforceable. See Shapiro v. Solomon, 42 N.J. Super. 377 (App. Div. 1956)(holding that plaintiff was able to pursue his *quantum meruit* claim despite having pled an express contract as alternative pleading of inconsistent claims is permissible). In addition, New Jersey's liberal approaches to pleading practice permit a party to seek relief on alternative grounds. Island Realty v. Bibbo, 329 N.J. Super. 528, 534-535 (App. Div. 2000). See also, Caputo v. Nice-Pak Products, Inc., 300 N.J. Super. 498, 504 (App. Div.) (both theories may be pled, though only one may yield a recovery), certif. denied, 151 N.J. 463, 700 (1997); Power-Matics, Inc. v. Ligotti, 79 N.J. Super. 294, 304 (App. Div. 1963) (recognizing that both theories may be pled when the applicability of the express contract is debatable, as in cases where rescission or voidances is alleged, or where the existence or enforceability of the express contract is a subject of contention).

36

Here, the Act provides that provisions of the CMA Renewals can be voided, in whole or in part, to prevent application of unlawful terms injurious to plaintiffs. N.J.S.A. 56:10-7(f). The value and goodwill in the franchise, created by plaintiffs, stands outside the four corners of the CMA. To the extent certain CMA terms purport to deprive plaintiffs of the benefit of this value, those terms should be voided under the Act. In the absence of a contractual provision addressing the subject matter at issue, unjust enrichment provides a vehicle for recovery.

By way of illustration, in Weichert Company Realtors v. Ryan, 128 N.J. 427 (1992), a case relied upon by BP in its brief, plaintiffs sought damages from defendants for the failure to pay brokerage services rendered by plaintiff's employee. Plaintiff's claims were based on defendants' alleged breach of contract, **or, in the alternative,** on a theory of quantum meruit. Id. at 430 (emphasis added). After finding that the parties never formed an express contract, the Court considered whether equitable relief was appropriate and held that plaintiff was entitled to recover the reasonable value of its employee's services on a theory of quantum meruit. Id. at 436-439, 441.

Similarly, plaintiffs' action here, sounding in unjust enrichment/*quantum meruit,* seeks recovery of damages for a benefit not governed by the CMA. BP seeks to enjoy the benefit

37

of plaintiffs' investment and goodwill in their service stations
after conclusion of the CMA relationship.  BP's determination to
refuse to compensate plaintiffs for their goodwill gives rise to
claims for unjust enrichment (Count Seven) and *quantum meruit*
(Count Eight).

### A.   Plaintiffs Have Established the Elements of Unjust Enrichment.

To establish unjust enrichment, a plaintiff must show that
that "defendant received a benefit and that retention of that
benefit without payment would be unjust."  Iliadis v. Wal-Mart
Stores, Inc., 191 N.J. 88, 110 (2007), (quoting VRG Corp. v. GKN
Realty Corp., 135 N.J. 539, 554 (1994)).

Plaintiffs have invested time, money, manpower and effort
to market and sell BP's products.  In doing so, plaintiffs have
so significantly increased the value of the franchise that BP's
appropriation of that value would be unjust under the
circumstances.  See Complaint, ¶123.  Clearly, BP's retention of
this benefit at the end of the CMA relationship without paying
compensation would be grossly inequitable.

### B.   Plaintiffs Have Established The Elements Of Quantum Meruit.

*Quantum meruit* "rests on the equitable principle that a
person shall not be allowed to enrich himself unjustly to the
expense of another."  See Starkey, Kelly, Blaney & White v.
Estate of Nicolaysen, 172 N.J. 60, 68 (2002).  Specifically,

38

where a party seeks recovery for services rendered in anticipation for a reasonable expectation of compensation, this type of recovery is known as *quantum meruit*, or "as much as he deserves." <u>Weichert</u>, 128 <u>N.J.</u> at 437-8. Here, based on BP's representations and on the state of the law, plaintiffs' expectation of receiving compensation for their businesses at the end of the relationship is most reasonable.

To recover under a theory of *quantum meruit*, the following elements must be established: "(1) the performance of services in good faith, (2) the acceptance of services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) reasonable value for services." <u>Starkey</u>, 172 <u>N.J.</u> at 68 (citation omitted).

BP asserts that even if plaintiffs' claims for *quantum meruit* could co-exist with the CMA, plaintiffs cannot establish the necessary elements for recovery. Despite BP's rhetoric, plaintiffs' investment of time, money, manpower and effort to market and sell BP's gasoline for BP's benefit, in turn, enriched the value of the BP franchise. Plaintiffs made improvements and investments with the reasonable expectation that they would be permitted to continue to carry out their franchise business in the future, and thus enjoy the benefit of their investment. Plaintiffs provided these services in good faith to benefit BP, with a reasonable expectation of

39

compensation.   BP, in turn, accepted those services, and in deciding to usurp the benefit of the value created by those services, BP became liable for their reasonable value.   Indeed, as set forth above, BP encouraged plaintiffs to hold such reasonable expectations, given the false promises BP made of a continued "trusting" relationship.   Therefore, plaintiffs have asserted a viable cause of action for quantum meruit in Count Seven of the Complaint, and BP's motion to dismiss on the pleadings should be denied.[10]

### POINT VII

### PLAINTIFFS HAVE PLED A VIABLE CLAIM FOR EQUITABLE ESTOPPEL.

In seeking to dismiss the Ninth Count of the Complaint, BP does not argue, as it cannot, that plaintiffs have failed to plead the necessary elements of a cause of action for equitable estoppel.   Rather, BP argues that the existence of an express contract precludes a claim sounding in equitable estoppel.   BP is wrong on the law.

BP's argument that a claim for equitable estoppel cannot be maintained if the parties have an express contract is unsupported by the cases it relies upon.   (Defendant's moving

---

[10] Luso found that the definite term of the CMA precluded any reasonable expectation of compensation at the end of the term. The Luso court failed to perceive that BP's appropriation of the business and goodwill upon termination of the CMA relationship necessarily results in unjust enrichment.

40

brief at 35-36).  Indeed, neither Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449 (1966), nor State by Parson v. United States Steel Corp., 22 N.J. 341, 358 (1956), (each cited by BP), hold that a claim for equitable estoppel "cannot be maintained where a party has remedies under an express contract."  See Id.  Rather, the Highway Trailer court held that an insurer's conduct estopped it from asserting a defect in the presentation of a claim.  Id., 46 N.J. at 449.  Similarly, the Parson court found that the defendant's failure to provide plaintiff with notice pursuant to the Custodial Escheat Act undermined its statute of limitations defense.  22 N.J. at 357-358.  Simply stated, BP cites to no authority supporting the core of its argument.

In any event, as briefed more fully above, New Jersey law permits plaintiffs to seek relief on alternative grounds.  Island Realty, 329 N.J. Super. at 534-535.  Thus, at this early stage in the litigation, pleading alternate theories of recovery is no basis for dismissal of the claims.

Finally, it is clear from the allegations in the Complaint, which must be taken as true, that plaintiffs justifiably relied upon BP's representations.  Plaintiffs have alleged that in connection with the CMA Renewals, they were assured by territory manager Anne Hauk and/or Anthony Cyriac, over the telephone and in person, that BP would maintain the CMA relationship after the

41

end of the current term.  See Complaint, ¶94.  In fact, those BP
representatives advised that the Court's September 2006 decision
required BP to do so.  Id., ¶95.  Further, by correspondence of
October  25,  2006,  BP  represented  to  the  Court  (and  to
plaintiffs) that it would not conclude the CMA relationship in
New Jersey. Id., ¶95; Hertzberg Decl., Exhibit B.  To allow BP
to now undertake a drastic shift in position after plaintiffs
reasonably  relied  on  BP's  representations  would  be  most
inequitable.

    To  establish  equitable  estoppel,  plaintiffs  need  only
allege that BP engaged in conduct, either intentionally or under
circumstances that  induced reliance,  and that  they acted  or
changed their position to their detriment.  Miller v. Miller, 97
N.J. 154, 163 (1984); Knorr v. Smeal, 178 N.J. 169, 178 (2003).
See  also,  Louisiana  Counseling  and  Family  Services,  Inc.  v.
Makrygialos, LLC, 543 F.Supp.2d 359, 367 (D.N.J. 2008).

    A claim is established where there is conduct that "amounts
to  misrepresentation  of  material  facts,  unknown  to  the  party
misled, done with the expectation that the misled party will
change his position based on the conduct, and that party in fact
changes its position."  Del Sontro v. Cendant Corp., Inc., 223
F.Supp.2d 563, 579 (D.N.J. 2002)(quoting Rodichok v. Limitorque
Corp., 1997 U.S. Dist. LEXIS 9975 (D.N.J. 1997)(citing Carlsen

42

v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339
(1979)).

Stated differently, equitable estoppel operates to prevent
a party from repudiating its previous conduct if such
repudiation would violate the demands of justice and good
conscience.  Carlson v. Masters, Mates & Pilots Pension Plan
Trust, 80 N.J. at 339.  As such, it is an equitable doctrine
founded in the fundamental duty of fair dealing imposed by law
invoked in "the interests of justice, morality and fairness."
Knorr, 178 N.J. at 169 (quoting Palatine I v. Planning Bd., 39
N.J. 546, 560 (1993).

Here, it is obvious that plaintiffs reasonably relied upon
BP's promises.

As noted, BP presented plaintiffs with a signed "Ethics
Certification," whereby BP represented to the plaintiffs that
their relationship was "founded on trust," and that BP is
"committed to respecting the rule of law and conducting business
with integrity."  Tokatlioglu Decl., Exhibit A.  Certainly,
plaintiffs were justified in believing not only BP's
representations to them, but in trusting BP's representations to
the Court.  Having induced plaintiffs to change their position
(investment and renewal) in reliance on promises of a continued
"trusting" relationship, BP should be equitably estopped from
now disavowing those promises.  That BP seeks to break its

43

promises for the purpose of appropriating the value of plaintiffs' businesses. Moreover, destroying plaintiffs' livelihoods in the process makes BP's conduct about as inequitable as conduct can be.

Clearly, plaintiffs have alleged the requisite elements of a claim for equitable estoppel. Accordingly, BP's motion to dismiss this claim on the pleadings should be denied.[11]

### CONCLUSION

For the foregoing reasons, the Court should deny BP's motion to dismiss the Complaint on the pleadings in all respects.

Respectfully submitted,

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Attorneys for Plaintiffs

By: s/Marc J. Gross
MARC J. GROSS

Dated:  April 14, 2010

---

[11] Plaintiffs do not press their affirmative claim sounding in unconscionability. However, as recognized by BP, unconscionably serves as a defense in the <u>Hillside</u> case and to any counterclaim BP will no doubt assert in this case.

44